**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**PAPA M. SOW,**

**Plaintiff,**

**v.**

**SYGMA,**

**Defendant.**

**Case No. 2:23-cv-4125**

**JUDGE DOUGLAS R. COLE**
**Magistrate Judge Jolson**

**OPINION AND ORDER**

Four years ago, The Sygma Network, Inc., fired Papa M. Sow after 15 years of service. Sygma said it did so because Sow engaged in certain misconduct. Sow did not believe that was the real reason. He sued Sygma, Sysco (Sygma's corporate relative), and two individual employees, arguing that Sygma instead fired him based on one or more of his race, national origin, or age. (Doc. 1-1). Sygma, the only remaining defendant, now seeks summary judgment. (Doc. 68). For the reasons explained below, the Court **GRANTS** that motion.

## BACKGROUND

Sygma stores and delivers food and food-related products from its 16 distribution centers across the United States. (Halbert Decl., Doc. 68-1, #443–44 (Dustin Halbert, Sygma's Vice President and General Manager)). Sow first started working for Sygma at its Columbus, Ohio, distribution center in 2007. (Sow Dep., Doc. 68-2, #474). He held various positions there over the years, but at the time of his firing in 2022, he was a "selector." (Doc. 68-1, #444). In that role, he read customer

orders, found the products throughout the warehouse, and collected them for packaging and shipment. (*Id.*).

He did all that using a device called a "wearable," which is an electronic pad that an employee straps to their forearm. (*Id.*). Relevant to Sow's job as a "selector," the screen displayed a customer's order and indicated where the items were located in Sygma's warehouse. (*Id.*). Sow then gathered the items together and prepared them to be shipped. (*Id.*). When an order was ready, Sow would press "enter" on the wearable and the device would provide another order for him to assemble. (*Id.*). If there were no more orders for a given selector to fill, the wearable would display a red screen indicating as much, and, under Sygma's policies, that selector was then required to ask his supervisor if there was anything else he should do before leaving for the day. (*Id.* at #445).

Sygma also uses the wearable to track employee activity more generally. It requires selectors to log in on their wearables while on the clock, and they must indicate on the wearable their activities throughout the day. (*Id.*). If they are not receiving and filling orders, they must enter a code for some other activity; these include ICLEAN, for cleaning, ILUNCH, for taking a lunch break, IBREAK, for taking some other break, and IMEET, for meeting with management. (*Id.*). Then, at the end of the day, they log out of the wearable, and then separately clock out of their shift. The wearable tracks all this (including whether and when the employee clocks out), and Sygma stores historical records of what code an employee had entered on their wearable throughout each day. (*See* Doc. 68-5, #925).

As noted above, Sygma terminated Sow's employment in 2022. Here's how that happened. On September 27, 2022, Sow's supervisor, Mallory Williams, found Sow sleeping in a stairwell just before 5 p.m. (*See* Doc. 68-5, #925). Sow had received a red screen while performing selector duties. He logged out of the wearable (but did not clock out, so he was still being paid), and Williams found him sleeping in a stairwell some thirty minutes after that.[1] (*Id.*).

Sow had a union position, so a collective bargaining agreement governed the relationship between Sow and Sygma. (*See* Doc. 68-2, #475). And that agreement designates "[s]leeping on the job during work hours" as a terminable offense (in fact, an offense that "require[s] immediate discharge"). (*Id.* at #550). Despite that provision, Sygma did not immediately discharge Sow. Instead, it gave him "[o]n a onetime, non-precedent setting basis," a "last chance at retaining his employment." (Doc. 68-5, #935). Under this so-called "last chance agreement," or LCA, Sow risked "discipline[] up to and including termination" for "[a]ny further incidents of sleeping on the job, loitering, or wasting time." (*Id.*).

About a month later, on October 26, 2022, the other shoe dropped. During work hours, a supervisor found Sow in an equipment room behind a large battery charger, looking at his phone. (*Id.* at #926; Doc. 68-2, #477–78). According to Sow, he got a red screen and had no other tasks to do, so he planned to, according to policy, ask

[1] There is apparently some dispute over whether Sow had logged out without clocking out, or instead had entered a code saying he was cleaning. The more favorable reading to Sow is that he had logged out without clocking out (as if he had put in a cleaning code that would have been an even greater misrepresentation of his activities), so that is the version of the facts that the Court adopts here.

Williams if he could leave. (*See* Doc. 68-2, #477–78). However, "[s]he was outside smoking." So he logged off the wearable and waited for her to return and confirm that he could clock out. (*Id.*). In the interim, Sow got a call from his lawyer. As a result he went to the equipment room to have a private spot to read related emails. (*Id.* at #478). Sygma, for its part, maintains that Sow was simply hiding out in the room to taking an undisclosed and unrecorded break. (Doc. 68, #425–26). Based on the selectors being "generally busy" on the day in question, it says Sow's story is likely false. (*See* Doc. 68-1, #446).

Halbert, currently Sygma's VP and GM, was its director of warehouse operations at the time. (Doc. 68-6, #1000). He was ultimately responsible for this kind of matter, and he decided to terminate Sow. (Doc. 68-1, #446). According to his declaration, he did this "based on [Sow's] violation of the [LCA]." Further, he claims he "did not know" Sow's race or national origin. (*Id.* at #449; *see also* Doc. 68-6, #1000).

Through the union, Sow filed a grievance. (Doc. 68-2, #475). That went to arbitration, and on November 14, 2023, the arbitrator upheld Sow's termination under the now-governing LCA. (Doc. 68-6, #1013–1016).

In the meantime, Sow also pursued other possible remedies. He filed a charge of discrimination with the Ohio Civil Rights Commission on January 26, 2023, claiming that Sygma had discriminated against him based on his race, national origin, and age. (*Id.* at #1018–20). To expand on that a bit, Sow is a Black man from the West African country of Cote d'Ivoire, and he was 53 years old when Sygma fired him, (Doc. 68-2, #476, 487). Because of the dual-filing arrangement between the

OCRC and the Equal Employment Opportunity Commission, his filing with the OCRC meant that Sow had also filed a charge of discrimination with the EEOC.[2] (*Id.* at #1017). And on December 15, 2023, soon after the arbitrator's decision, Sow brought this suit. (Doc. 1-1). At first, beyond Sygma, he named Halbert, Williams, and Sysco as defendants. (Doc. 6, #38). But the Court, acting through the then-assigned judge, dismissed his claims against everyone except Sygma with prejudice. (Doc. 22, #102). After trading blows with Sow in various discovery disputes, (*see, e.g.*, Doc. 57), and a fruitless attempt at mediation, (*see* Doc. 58), Sygma now moves for summary judgment, (Doc. 68). The matter is ripe for decision.

## LEGAL STANDARD

A party can win summary judgment on a claim if they "show[] that there is no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the Court must keep in mind that "[t]he 'party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S.

[2] The OCRC issued Sow a notice of right to sue on January 11, 2024. (Doc. 68-6, #1021). The record does not reflect whether the EEOC ever did so. The relevant statute, 42 U.S.C. § 2000e-5(f), generally requires plaintiffs suing under Title VII of the Civil Rights Act to obtain such a notice. In pleading his compliance with § 2000e-5(f)(1), Sow appears to rely on the Ohio notice. (Doc. 27, #116). But (f)(1)'s requirements are not jurisdictional, *Rivers v. Barberton Bd. of Educ.*, 143 F.3d 1029, 1031 (6th Cir. 1998), and Sygma has not raised the issue, so the Court considers any argument on this front forfeited.

317, 323 (1986)). But the non-moving party cannot defeat the motion merely by pointing to *any* factual dispute. Rather, "the requirement is that there be [a] genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (emphasis omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

In short, the nonmoving party must present some "sufficient disagreement" that would require submission to a jury. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In deciding whether they have made a sufficient showing for a reasonable jury to find for them, though, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). That is, "the court must afford all reasonable inferences … to the nonmoving party." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

## LAW & ANALYSIS

Sow asserts three claims against Sygma: (1) discrimination based on race, (2) discrimination based on national origin, and (3) discrimination based on age. The first two claims arise under Title VII of the Civil Rights Act. *See* 42 U.S.C. § 2000e-2(a). The third comes from the Age Discrimination in Employment Act of 1967 (ADEA). *See* 29 U.S.C. § 623(a)(1). The framework that applies to all three is nearly identical. So the Court starts there and then discusses how that framework plays out for the three claims.

### A. *McDonnell Douglas* Applies to Each of Sow's Claims.

Because all three discrimination claims rely on circumstantial, indirect evidence, the Court uses the *McDonnell Douglas* burden-shifting framework—or a version of it at least—for each. *See Pelcha v. MW Bancorp, Inc.*, 455 F. Supp. 3d 481, 497 (S.D. Ohio 2020); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). For the two Title VII claims, the straightforward *McDonnell Douglas* test applies. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). The ADEA claim, subject to gathering storms,[3] involves a "modified version" of that test. *Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 396 (6th Cir. 1993).

The basic analysis has three steps. First, for Sow's race and national origin claims, he has the burden of making out a prima facie case of discrimination by showing four elements: that (1) he is a member of "a protected class," (2) he "suffered an adverse employment action," (3) he "was qualified for the position," and (4) he either "was replaced by someone outside the protected class" or "similarly-situated, non-protected employees" received more favorable treatment. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)). That showing, if made, raises a presumption of discrimination and imposes on the defendant a burden of production. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981). At this second step, the defendant

[3] The Supreme Court, multiple times, has refused to "definitively decide[] whether" *McDonnell Douglas* applies in ADEA cases. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 n.2 (2009); *see also O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996). But until something changes, "in this circuit" courts must use *McDonnell Douglas* "to analyze ADEA claims based on circumstantial evidence." *Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009).

must produce "evidence that" the adverse action the plaintiff showed was actually taken "for a legitimate, nondiscriminatory reason." *Id.* If the defendant succeeds in that endeavor, the presumption becomes "irrelevant." *St. Mary's*, 509 U.S. at 507. The burden then moves for the last time, tasking the plaintiff with showing, at the third step, that the defendant's proffered reason was merely a "pretext for discrimination." *Burdine*, 450 U.S. at 253.

The "modified" *McDonnell Douglas* test that applies to Sow's ADEA claim is, with two caveats, identical to the original. *Roush*, 10 F.3d at 396. First, the relevant "protected group" for the first element of the prima facie case differs from that used for the fourth. To satisfy the first element, a plaintiff must show they are over the age of 40. 29 U.S.C. § 631(a). But the Supreme Court has explained that mechanically applying the fourth element—unfavorable treatment compared to similarly situated employees outside of the group—is improper. *O'Connor*, 517 U.S. at 312. That is because the ADEA's substantive prohibition is merely against discrimination "because of [an] individual's age." *Id.* (quoting 29 U.S.C. § 623(a)(1)). So the statute also covers a 40+ year old who "has lost out to another person in the protected class," "so long as he has lost out *because of his age*." *Id.* The second caveat is that the plaintiff's ultimate burden under the ADEA is harder to meet than under Title VII. *See Gross*, 557 U.S. at 174. In particular, Title VII permits recovery if the impermissible consideration was "a motivating factor" for the adverse action. *See* 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B). But the ADEA's "because of [] age" formulation requires a showing of "'but for' causation." *Gross*, 557 U.S. at 176 (first

quoting 29 U.S.C. § 623(a)(1); and then *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63–64 & n.14 (2007)).

Sygma's motion argues that Sow cannot satisfy his burden under the *McDonnell Douglas* test for any of his claims. (Doc. 68, #428). Starting at the first step of the test, Sygma argues that Sow has not presented evidence sufficient for a jury to find that Sygma replaced Sow with a non-protected individual or treated him disparately poorly (the fourth element of the prima facie case). (*Id.* at #428–34). As for steps two and three of the burden-shifting framework, Sygma, pointing to the last chance agreement, argues that it has met its burden of producing a legitimate, non-discriminatory reason for firing Sow (step two) and that Sow has no evidence that Sygma's invocation of the LCA was pretextual (step three). (*Id.* at #434–39).

### B. Sow's Claims Fail on Steps Two and Three of the *McDonnell Douglas* Analysis.

The Court elects to skip over *McDonnell Douglas*'s first step here. That is because, even assuming that Sow makes out a prima facie case, Sygma has presented a legitimate, non-discriminatory reason for firing him which Sow cannot show was pretextual. Sygma argues here that it fired Sow for the same reason it posited at the time—Sow's violation of the LCA. (Doc. 68, #434; Doc. 68-6, #1000). As discussed above, that agreement proscribed "loitering" and "wasting time" based on Sow's previous misconduct of sleeping on the job, (Doc. 68-6, #1001), and Sow's supervisors found him on his phone in a secluded equipment room, not working, while he was on the clock, (Doc. 68-5, #926). As Sygma's burden at step two is merely to "raise[] a

genuine issue of fact as to whether it discriminated against" Sow, *Burdine*, 450 U.S. at 254, it's made a sufficient showing here.

That leaves one question: was Sygma's decision pretextual? *Id.* Sow has three avenues available for demonstrating pretext: he must show that either (1) "the proffered reasons had no basis in fact," (2) "the proffered reasons did not actually motivate the employer's action," or (3) the proffered reason was "insufficient to motivate the employer's action." *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 350–51 (6th Cir. 2021) (citation modified) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). Sow's burden at this stage is to "produce evidence that would allow a jury to reject" Sygma's "stated reasons and infer that the real reason" was Sow's race, national origin, or age. *Bashaw v. Majestic Care of Whitehall, LLC*, 130 F.4th 542, 548 (6th Cir. 2025). Sow makes several arguments to try to meet that burden, but none of them work.

**1.** Sow first argues that the LCA must not have motivated Sygma's conduct because other, comparable individuals faced less severe discipline than he did. This is admittedly one viable route to demonstrating pretext. *See Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303–04 (6th Cir. 2016). Moreover, to show that another employee was "similarly situated," Sow "need not demonstrate an exact correlation with the employee receiving more favorable treatment." *Wright*, 455 F.3d at 709–10 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). But still he must show that he and the "claimed comparator" are "similarly situated … in all relevant respects." *Id.* at 710 (quoting *Ercegovich*, 154 F.3d at 353).

What that means here, "[i]n the disciplinary context," is that Sow's "proposed comparator[s] must have engaged in acts of 'comparable seriousness.'" *Id.* (quoting *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002)).

Sow proposes four Sygma employees as comparators who received more lenient treatment: Kristen Whitt, Collin Spaulding, Chris Bewley, and Kyle Dacanay. (Doc. 72, #1106). All four are white and younger than Sow; and, while neither party has said anything on the matter, presumably none hail from the Ivory Coast. But these four comparators do not move the ball on pretext. That is because two of the employees were not similarly situated to Sow and the two who were did not receive more favorable treatment.

Start with the two who are not similarly situated. Whitt is a white woman who, at the time in question, was 42-years old. (Doc. 68-1, #447). Sygma offered her an LCA in 2022 after she violated the company's drug and alcohol policy. (Doc. 74-2, #1168). Under that proposal, if she violated the policy again or left her assigned work area without permission anytime over the next 18 months, then she would face discipline "up to and including termination." (*Id.*). Whitt agreed to all this, and, according to Halbert, she "never violated the [LCA]" and Sygma never fired her. (Doc. 68-1, #447). Sow, on the other hand, did violate his LCA, and that violation was Sygma's stated grounds for firing Sow. (Doc. 68-6, #1001). That precludes a finding that they were similarly situated.

How about Spaulding? He is white and was roughly 25 in 2022. (Doc. 68-1, #446). By March of that year, he had accrued seven attendance violations, which the

CBA calls "occurrence[s]." (Doc. 74-2, #1165; Doc. 68-2, #551). Under the CBA, Sygma can discharge an employee who has seven attendance occurrences over the course of a year. (Doc. 68-2, #551–52). But instead of firing him, Sygma offered Spaulding an LCA which he accepted. (Doc. 74-2, #1165). That agreement provided that any further attendance occurrences in the next six months would "result in termination." (*Id.*). Later, Spaulding entered another LCA but not for attendance reasons. This one was for violating Sygma's drug and alcohol policy. (*Id.* at #1167). Under this agreement, Spaulding risked "discipline[] up to and including termination" if he again violated the drug and alcohol policy or if he left his assigned work area without permission. (*Id.*). Spaulding complied with both LCAs, and, Halbert says, Sygma accordingly did not terminate him. (Doc. 68-1, #446).

Sow and Spaulding are not similarly situated either. True, Spaulding had two separate LCAs, and that might sound paradoxical. But the agreements related to different conduct. By its terms, Spaulding could have violated his first LCA only by committing another attendance infraction. (Doc. 74-2, #1165). His later alcohol offense was thus irrelevant to the prior LCA (although it did give rise to a separate one). In short, Spaulding did not violate his LCA (either one of them). But Sow did. Sow's LCA, like Spaulding's, prohibited only future misconduct generally related to the instant offense—for Sow, sleeping while on the clock. To that end, it forbade Sow from "sleeping on the job, loitering, or wasting time." (Doc. 68-6, #1001). So Sow's later misconduct—"logg[ing] off of his equipment and hiding [while] on his phone" during work hours—fell within the plain language of the LCA's prohibition. (*Id.* at

#997). That means Spaulding, who complied with his LCAs, is not similarly situated to Sow, who did not.

That leaves the other two potential comparators. They are similarly situated to Sow, but Sygma did not treat them any better than it treated him. When Sygma fired Kyle Dacanay in 2022, he was 32 years old. One day in January of that year Dacanay spent "an extreme amount of time … not working while on the clock." (Doc. 68-5, #959). Rather than terminate him, Sygma offered Dacanay an LCA under which he would be fired if he "violat[ed] any work rules … pertaining to wasting time or time theft." (*Id.*). A few months later, Dacanay took a two-plus hour break, which included a nap, without clocking out. (*Id.* at #957). So Sygma terminated him "for violating his [LCA]." (*Id.* at #955). Sow argues that this demonstrates "differing disciplinary outcomes," (Doc. 72, #1106), but it is hard to see how. Sow and Dacanay committed similar misconduct, resulting in similar LCAs, and the basics of their termination offenses are identical. Both were clocked in and getting paid while they took unauthorized breaks.

Last up is Chris Bewley, whose story is admittedly the most complicated. Bewley is white, and he was about 46 years-old when he was fired in 2022. In August 2021, he was found off premises while on the clock. (Doc. 68-6, #994). That resulted in an LCA, which said that "any violations of any work rules per the [CBA] (excluding attendance) for the next 12 months [would] result in termination." (*Id.*). A month later, he was found sleeping in his car while on the clock. (*Id.* at #990). And Sygma

fired him soon after that because of "the violation of his last chance agreement." (*Id.* at #993).

Sow says Bewley received multiple LCAs before separation despite "repeated sleeping-related incidents and other disciplinary concerns." (Doc. 72, #1106). Sow's claim is half true; Bewley only received one LCA, but supervisors had written him up for similar violations multiple times in the preceding years. But while he had more priors than Sow, Bewley's old offenses were materially different. Three were for taking longer breaks than allotted. (*See* Doc. 68-6, #966, 969, 984). And there was a sleeping offense that resulted in neither an LCA nor immediate termination. (*See id.* at #980). That might lead one to think that Bewley got three chances while Sow only got two, but it appears that Bewley's first sleeping incident didn't amount to time theft. Rather, he was sleeping during an extended break. (*See id.*). So it's true that he was sleeping "during work hours," (Doc. 68-2, #550), but he wasn't being paid for it.

Once Bewley pulled similar shenanigans "while on the clock," Sygma put him under an LCA. (Doc. 68-6, #994). And when he violated that LCA, Sygma fired him. (*Id.* at #993; Doc. 68-1, #447–48). Sow likewise had previously committed a less serious infraction—taking an unscheduled break while on duty. (Doc. 68-6, #1002). As with its treatment of Bewley, Sygma did not put Sow under an LCA then, but instead only after the more egregious sleeping-on-the-clock incident. (*Id.* at #1001). And, just as with Bewley, Sygma fired Sow when he violated the terms of that LCA. (*Id.* at #1000; Doc. 68-1, #446).

In short, Sow has not posited any similarly situated individual who Sygma treated better than him.

**2.** Sow's next tactic is pointing to what he perceives as inconsistencies in Sygma's various statements and explanations for firing him. According to Sow, this waffling at least means there's a triable issue on pretext. The Court again disagrees.

Sow's argument boils down to this: when Sygma first terminated him, and in its evidence here, Sygma cites finding him on his phone in the secluded equipment room. At his arbitration, by contrast, Sygma pointed to his violation of the LCA by wasting time. (Doc. 72, #1105; 1107). To put this argument in context, let's review Halbert's arbitration testimony. There, Halbert asserted that his decision to terminate Sow was "based on him violating his [LCA]," and it was his and Sygma's position that "his violation of the [LCA] [was] because he was wasting time and loitering." (Doc. 68-3, #710). Halbert further affirmed that Sygma did not fire Sow for being on his phone. (*Id.* at #710–11). He offered that explanation because, at the arbitration, one strategy the union pursued had two prongs: (1) casting Sygma's decision as based on Sow's use of his phone in the equipment room, and (2) showing that phone use was commonplace in the warehouse and that discipline for it was rare, to say nothing of termination. (*See* Doc. 68-2, #582–83; Doc. 68-4, #754). So Halbert was explaining why that argument did not work on the facts here.

It is true that "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996). But that's not what happened here. Sow's

LCA prohibited "sleeping on the job, loitering, or wasting time" (Doc. 68-5, #935). And Sow's conduct in going to the equipment room while on the clock constituted, according to Sygma, loitering and wasting time. (Doc. 68-3, #710). It happened to be the case that he was on his phone while he was wasting time, so it would be hard to avoid mentioning the phone when describing the incident. (*See, e.g.*, Doc. 68-5, #926). But that mere mention of his phone use does not make that phone use the *reason* for Sow's termination. In justifying firing Sow, Sygma has consistently pointed—at the time it fired him, in the arbitration, and here—to his violation of the LCA. That some explanations of that LCA violation have offered more detail than others in describing the conduct at issue does not change anything.

**3.** Sow next points to evidence that Sygma had discretion to not terminate him under the LCA and that the language used across different LCAs with other employees is inconsistent in this regard. (Doc. 72, #1105–06). Sow is right that his LCA did not require termination; rather, it said further misconduct would "be disciplined up to and including termination." (Doc. 68-6, #1001). He is also right that some of Sygma's LCAs with other employees have used more explicit language. (*See* Doc. 74-2, #1162, 1165). But Sow has articulated no reason why these facts might lead someone to suspect that Sygma fired him for discriminatory reasons—let alone lead a reasonable jury to find by a preponderance that Sygma did so.

In the first place, the LCA, in clear terms, empowered Sygma to fire Sow. So this is not a situation where the employer has failed to adhere to its disciplinary policies. *Cf. Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 896 (6th Cir. 2020).

And, as the Court demonstrated when explaining why Sow hasn't shown that he was singled out for worse treatment relative to his proposed comparators, Sow has not presented any evidence that Sygma does not uniformly fire employees who violate an LCA.

That brings up Sow's next point, that some LCAs provide for automatic termination while others, like the one that applied to him, contemplate the possibility of lesser discipline. On the face of things, this seems like an odd move for Sow. Sygma used the *less* punitive phrasing in Sow's LCA, which does not cry out that Sygma is discriminating *against* him. (Doc. 68-6, #1001). But perhaps what Sow means to argue is that Sygma cannot rely on its firings under more severe LCAs to show that its LCA-based termination of Sow was not pretextual, given the materially different language. The strength of that argument turns on whether something significant lies beneath the surface of the differing language. But Sow has not offered evidence of any rhyme or reason to how Sygma phrases the LCAs. Without at least some evidence on that front, there's no basis for thinking Sow was singled out for worse treatment, much less that Sygma terminated him based on his race, national origin, or age, merely because his LCA used less severe language.

**4.** Now turn to Sow's final set of arguments. Sow argues that Sygma did not adequately investigate his conduct before firing him, that this was inconsistent with how it approached terminating Chris Bewley, and that the true story of Sow's violations show that his firing was unjustified. (Doc. 72, #1106–07, 1108).

Taking the last point first, Sow states that he was not "wasting time," as Sygma suggests, but was instead merely waiting for his supervisor to return so he could get his next orders. (*Id.* at #1108; Doc. 68-2, #477–78). That may be so, but Sow does not dispute that he was sitting in the equipment room on his phone while on the clock. (Doc. 68-2, #477–78; Doc. 68-6, #1015). And that was all the LCA required to put Sow at risk of termination. The Court's role at this stage is not to relitigate the arbitrator's conclusion that Sow's story was not credible. (*See* Doc. 68-6, #1014–15). Rather, the Court need only determine whether Sygma's belief about events was "reasonably based" "on the particularized facts that were before it at the time the decision was made." *Wright*, 455 F.3d at 708 (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). It was.

To see why that is so, turn to the first point Sow raised—Sygma's investigation of Sow's conduct. Sygma held a termination hearing, collecting testimony about the event. (Doc. 68-3, #702). And before that, Halbert emailed with the supervisor who reported Sow's conduct and spoke with Sow personally about it. (Doc. 68-5, #937). So Sygma knew the basic (undisputed) facts—that Sow had been found in the equipment room logged off his wearable without clocking out. Based on this information, it would be hard to call Sygma's conclusion that Sow was wasting company time unreasonable. (*Accord* Doc. 68-6, #1013–15). And that holds true even crediting Sow's explanation, which seeks to excuse those facts rather than deny them. At bottom, the investigation and its results were adequate, at least considered in isolation, to avoid a finding of pretext.

That leaves the last of Sow's many attempts on the pretext front—his argument that Sygma's investigation into Sow's conduct was lacking compared to its earlier investigation into Chris Bewley. As a reminder, Bewley is one of Sow's proposed comparators; Sygma fired Bewley after he violated an LCA, and the misconduct there was preceded by several minor violations. *See supra*, Part B.1. Before firing Bewley, Sygma apparently developed a report of its investigation into the allegation that Bewley had abandoned the premises without clocking out. (*See* Doc. 74-2, #1151–53). In making this report, Halbert and others reviewed written statements by Bewley's supervisors as well as Bewley's old records and relevant security footage. (*Id.* at #1151).

The record does not indicate that Sygma did anything of the kind for Sow's case, and in its reply, Sygma does not claim as much. (Doc. 76, #1200). So that amounts to at least some apparent disparity. But this disparity does not create a triable issue on pretext. As discussed above, disparate treatment among employees is significant only if the plaintiff and the comparator-employee are similar "in all relevant respects." *Wright*, 455 F.3d at 709–10 (quoting *Ercegovich*, 154 F.3d at 353). Bewley had left the workplace on the clock, injured himself in a car accident right outside Sygma's facility, and returned over an hour later to clock out. (Doc. 74-2, #1152). It seems understandable that Sygma wanted to give Bewley's case a close look in light of the "head-on collision," "people lying in the street," and Bewley's display of his "injured and bloody hand" on returning to clock out. Compared to that, the facts relevant to assessing Sow's violation were simple: either he was in the

equipment room while still clocked in or not. Considering the clear differences between the two situations, merely pointing to differences in how Sygma chose to investigate them is not sufficient to create a factual dispute on pretext.

* * *

Sow has not pointed to any examples of disparate treatment that actually involved someone in a similar situation receiving more favorable treatment. And he has offered no other reasons a jury might infer that Sygma fired him because of his race, national origin, or age rather than his violation of the LCA. So, as Sygma has offered a legitimate, non-discriminatory rationale for terminating Sow's employment, Sow's claims fail even assuming that he's made out a prima facie case.

## CONCLUSION

For the foregoing reasons, Sygma's Motion for Summary Judgment (Doc. 68) is **GRANTED**. The clerk is **DIRECTED** to **ENTER JUDGMENT** in favor of Sygma and **TERMINATE** this case on the Court's docket.

**SO ORDERED.**

November 10, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**